**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KETCHIKAN DRYWALL SERVICES, INC.,

*Petitioner*,

v.

IMMIGRATION AND CUSTOMS ENFORCEMENT; OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER,

*Respondents*.

No. 11-73105

OCAHO No. 10A00034

OPINION

On Petition for Review of an Order of the
Office of the Chief Administrative Hearing Officer

Submitted April 8, 2013[*]
Seattle, Washington

Filed August 6, 2013

Before: Dorothy W. Nelson, A. Wallace Tashima,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

---

[*] The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2)(C).

# SUMMARY[**]

### Immigration

The panel denied Ketchikan Drywall Services' petition for review from an Administrative Law Judge's decision which upheld the Immigration and Customs Enforcement's finding that KDS violated the Immigration and Nationality Act and the resulting civil penalty.

The panel held that KDS violated 8 U.S.C. § 1324a(b), which requires employers to verify that their employees are legally authorized to work in the United States. The panel held that it is neither arbitrary nor capricious to require that employers complete Employment Eligibility Verification Forms ("I-9 Forms"), and that copying and retaining documents is neither necessary nor sufficient for compliance. The panel gave *Skidmore* deference to the classification of "substantive" and "technical or procedural" violations contained in the Virtue Memorandum, interim guidelines published in 1997 by the Immigration and Naturalization Service, and found that KDS was penalized for substantive deficiencies in its I-9 Forms.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Robert Pauw, Gibbs Houston Pauw, Seattle, Washington, for Petitioner.

Stuart F. Delery, Acting Assistant Attorney General, Ernesto H. Molina, Jr., Assistant Director, Andrew N. O'Malley, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondents.

**OPINION**

TASHIMA, Circuit Judge:

Section 274A(b) of the Immigration and Nationality Act imposes an obligation on employers to verify that their employees are legally authorized to work in the United States. 8 U.S.C. § 1324a(b). Regulations designate the Employment Eligibility Verification Form ("I-9 Form") for this purpose, 8 C.F.R. § 274a.2(a)(2), and employers must retain these forms and provide them for inspection upon three days' notice. 8 C.F.R. § 274a.2(b)(2)(ii). This case arises out of the results of one such inspection in which Immigration and Customs Enforcement ("ICE") discovered violations of the verification requirements of § 1324a(b).

Ketchikan Drywall Services, Inc. ("KDS") petitions for review from the summary decision of an Administrative Law Judge ("ALJ") in favor of ICE on 225 out of 271 alleged violations of § 1324a(b) and the resulting civil penalty of $173,250.00. KDS argues that it substantially complied with the requirements of the statute, that the ALJ improperly

refused to consider certain documents, and that the penalty was improperly calculated. We have jurisdiction under 8 U.S.C. § 1324a(e)(8) and deny the petition.

## I.

KDS is a drywall installation company incorporated in Washington State. It employs four full-time employees and approximately twenty part-time employees. It also hires additional employees as needed on a project-by-project basis. KDS does not hire workers "in the field," but requires them to go to its main office first to fill out I-9 Forms.

Over the years, more than a dozen different employees have been responsible for collecting I-9 Forms from new hires, but until 2006, KDS did not employ any staff with training in I-9 compliance. In 2000, KDS received a Warning Notice from the Immigration and Naturalization Service[1] ("INS") following an audit of its I-9 Forms. In 2006, KDS finally hired a new Controller with I-9 training who initiated efforts to improve compliance.

In March 2008, ICE served a Notice of Inspection and administrative subpoena on KDS, requesting "[o]riginal I-9 Forms . . . and any copies of attached documents presented at the time of I-9 completion for employees working from January 1, 2005 to March 25, 2008." KDS produced some I-9 Forms and other employee verification documents on April 2, 2008. On April 4, 2009, ICE served a Notice of Intent to Fine ("NIF"), and KDS subsequently made a further

---

[1] ICE has since succeeded to these functions of the INS. *See* The Homeland Security Act of 2002, Pub. L. No. 107-296, 110 Stat. 2135 (Nov. 25, 2002).

production of documents.  ICE accepted these documents, reviewed them, and served an amended NIF on October 30, 2009.

The amended NIF contained four counts.  Count I covered 43 employees for whom KDS had failed to provide any I-9 Form at all, in violation of § 1324a(b) and 8 C.F.R. § 274a.2(b).  Count II covered 65 employees for whom Section 1 ("Employee Information and Attestation") of the I-9 Forms was incomplete, in violation of § 1324a(b)(2)[2] and 8 C.F.R. § 274a.2(b)(1)(i).[3]  Count III covered 110 employees for whom Section 2 ("Employer or Authorized Representative Review and Verification") of the I-9 Forms

---

[2] This subsection reads, in its entirety:

> The individual must attest under penalty of perjury on the [I-9 Form], that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this chapter or by the Attorney General to be hired, recruited, or referred for such employment.  Such attestation may be manifested by either a hand-written or an electronic signature.

8 U.S.C. § 1324a(b)(2).

[3] This subsection reads, in relevant part:

> A person or entity that hires or recruits or refers for a fee an individual for employment must ensure that the individual properly . . . [c]ompletes section 1– "Employee Information and Verification"–on the Form I-9 at the time of hire and signs the attestation with a handwritten or electronic signature . . . .

8 C.F.R. § 274a.2(b)(1)(i).

was incomplete, in violation of § 1324a(b)(1)[4] and 8 C.F.R. § 274a.2(b)(1)(ii).[5]   Count IV covered 53 employees for whom there were omissions in both Section 1 and Section 2. ICE ordered KDS to pay a civil penalty of $286,624.25.

KDS requested a hearing before an ALJ, and ICE filed its four-count complaint with the Office of the Chief Administrative Hearing Officer.   KDS responded to the complaint and, together with its response, it produced for the first time more copies of identification and employment authorization documents.   The ALJ refused to consider these late-produced documents.   He granted ICE's motion for

---

[4] This subsection reads, in relevant part:

> The [employer] must attest, under penalty of perjury and on [the I-9 Form], that it has verified that the individual is not an unauthorized alien by examining [the appropriate documents].

8 U.S.C. § 1324a(b)(1)(A).

[5] This subsection reads, in relevant part:

> [A]n employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, must within three business days of the hire . . . [p]hysically examine the documentation presented by the individual establishing identity and employment authorization . . . and ensure that the documents presented appear to be genuine and to relate to the individual; and . . . [c]omplete section 2–"Employer Review and Verification"–on the Form I-9 within three business days of the hire and sign the attestation with a handwritten signature or electronic signature . . . .

8 C.F.R. § 274a.2(b)(1)(ii).

summary decision for 23 violations under Count I, 41 violations under Count II, 110 violations under Count III, and 51 violations under Count IV, for a total of 225 violations. The ALJ granted KDS' motion for summary decision on the remaining violations.

The ALJ adopted ICE's proposed base penalty, but adjusted it downwards to reflect the fact that fewer violations had been proven than alleged. The ALJ rejected both parties' arguments regarding aggravating or mitigating factors, and ordered KDS to pay a civil penalty of $173,250.00. This petition for review followed.

## II.

## A.

KDS contends that many of the violations that the ALJ found were not violations at all, on the ground that it had copied and retained documentation for these employees and that any omissions from the I-9 Forms themselves were either minor or could be filled in by reference to the copied documents. KDS also argues that the ALJ erred in refusing to consider those documents produced for the first time with its summary decision materials, and that those documents cure the deficiencies in the I-9 Forms to which they relate. Finally, KDS argues that the penalty was improperly calculated and should have been reduced to reflect both its good faith efforts to comply with its statutory obligations and the non-serious nature of any violations.

We review agency action under the narrow "arbitrary [or] capricious" standard as set forth in the Administrative Procedure Act. 5 U.S.C. § 706(2)(A); *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011). We do not grant deference under *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), to an agency's interpretation of a statute unless it appears both "that Congress delegated authority to the agency generally to make rules carrying the force of law, *and* that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (emphasis added). Even where it does not qualify for *Chevron* deference, however, agency action may still qualify for deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), where it exhibits persuasive characteristics. *Mead*, 533 U.S. at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertise, and to the persuasiveness of the agency's position." (citing *Skidmore*, 323 U.S. at 139–40)). We do not overturn an agency's determination of a civil penalty "unless it is either 'unwarranted in law or unjustified in fact.'" *Balice v. U.S. Dep't of Agric.*, 203 F.3d 684, 689 (9th Cir. 2000) (quoting *Bosma v. U.S. Dep't of Agric.*, 754 F.2d 804, 810 (9th Cir. 1984)).

## B.

KDS first argues that it fully complied with its statutory obligations by copying and retaining its employees' verification documents together with partially completed I-9 Forms, because the documents showed the employees' eligibility for work and the forms had been signed. KDS further argues that any other deficiencies should be excused

as merely "technical or procedural" failures, made in spite of "good faith attempt to comply." *See* 8 U.S.C. § 1324a(b)(6)(A). Finally, it contests several specific violations that the ALJ found with respect to Sections 1 and 2 of its I-9 Forms. We address these arguments *seriatim*.

## 1.

KDS argues that § 1324a(b)(4) unambiguously allows an employer simply to copy and retain its employees' verification documents in order to comply with the verification and documentation requirements imposed by § 1324a(b). That provision reads, in relevant part:

> Notwithstanding any other provision of law, the person or entity may copy a document presented by an individual pursuant to this subsection and may retain the copy, but only . . . for the purpose of complying with the requirements of this subsection.

8 U.S.C. § 1324a(b)(4). KDS asks this Court to read § 1324a(b)(4) as providing an *alternative* to filling out the forms completely. The statute, however, does not allow for such an interpretation. Under a plain reading of its text, nothing in § 1324a(b)(4) relieves employers of any of the statutory verification and documentation obligations imposed in § 1324a(b)(1) and (2). Nor is it written in terms of providing employers with an alternative method of complying

with those subsections.[6]  That the statute permits the copying and retention of documents for the purpose of complying with the statute does not mean that employers need do nothing further in order to comply.  In other words, copying and retaining documents is neither necessary nor sufficient for compliance, and § 1324a(b)(4) simply makes clear that it is permitted.

Regulations confirm this understanding that compliance requires that the relevant information from the documents be transcribed onto the I-9 Form, regardless of whether copies of the documents are retained.  8 C.F.R. § 274a.2(b)(3) explains that, while copying of documents is not required, it is permitted; it also goes on to explain that "[t]he copying . . . and retention of the copy or electronic image does not relieve the employer from the requirement to fully complete section 2 of the Form I-9."  KDS asks us to read this regulation in light of two cases that preceded its promulgation, *United States v. Manos & Assocs., Inc.*, 1 OCAHO no. 130, 1989 WL 433857 (Feb. 8, 1989), and *United States v. J.J.L.C., Inc. t/a Richfield Caterers*, 1 OCAHO no. 154 at 1096, 1990 WL 512156 (Apr. 13, 1990), which could be read to stand for the proposition that partial completion of an I-9 Form might be sufficient.  But we must interpret the regulation by its own terms, for it has superseded whatever rule *Manos* and *Richfield Caterers* may have established.  "Fully" means "fully," and not, as KDS argues, "partially."

---

[6] Where Congress wishes to provide alternatives, it knows how to do so.  For example, § 1324a(b)(1)(A) clearly provides for alternatives in terms of which kinds of documents an employer may rely on when verifying an employee's work authorization.  8 U.S.C. §§ 1324a(b)(1)(A)(i), (ii).

KDS argues that it is senseless to require employer and employees to waste the time necessary to transcribe information onto I-9 Forms when that information is already available on an attached copy of the relevant document. But requiring that the parties take the time to copy information onto the I-9 Form helps to ensure that they actually review the verification documents closely enough to ascertain that they are facially valid and authorize the individual to work in the United States. The I-9 Form also provides concrete evidence that such review took place. Further, aggregation of all of the relevant information onto one form allows for easier review of that information by ICE. It is neither arbitrary nor capricious to require that employers actually complete their I-9 Forms.

## 2.

KDS argues in the alternative that even if it has not complied with all of its verification and documentation obligations under § 1324a(b), its non-compliance should nevertheless be treated as compliance under § 1324a(b)(6)(A),[7] because any deficiencies were

---

[7] This subsection reads, in relevant part:

> [A] person or entity is considered to have complied with a requirement of this subsection notwithstanding a technical or procedural failure to meet such requirement if there was a good faith attempt to comply with the requirement.

8 U.S.C. § 1324a(b)(6)(A). Congress added this "good faith" defense, also known as the "Bono Amendment," in 1996. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 411, 110 Stat. 3009 (Sep. 30, 1996).

merely "technical or procedural," made in spite of a "good faith attempt to comply."  It urges us to rely on a Congressional committee report from 1986 explaining the elements of a "good faith" defense under § 1324a(a)(3),[8] and cites *Montero-Martinez v. Ashcroft*, 277 F.3d 1137, 1142 (9th Cir. 2002), for the proposition that a term should be given the same meaning throughout the statute.  But the meaning of a term like "good faith attempt" necessarily changes with context, even within a single statute:  an employer may make a "good faith" effort to comply with the statute in some regards without making a corresponding effort to comply in others.  Because employers' substantive obligation to avoid employing unauthorized individuals differs from their procedural obligation to verify and document that their employees are authorized to work, we are not persuaded that the elements that might establish a defense to violations of the one should also establish a defense to violations of the other.  Accordingly, we must look elsewhere for guidance on how best to interpret §1324a(b)(6)(A).

In 1997, the INS published extensive interim guidelines interpreting what constituted "technical or procedural" violations as opposed to "substantive" violations.  *See* Memorandum from Paul S. Virtue, INS Acting Exec. Comm'r of Programs, Interim Guidelines:  Section 274A(b)(6) of the Immigration and Nationality Act Added by Section 411 of the Illegal Immigration Reform and Immigrant

---

[8] This report suggested that an employer should be entitled to a "good faith" defense for violations of § 1324a(a)(1)(A)'s prohibition against hiring unauthorized individuals where that employer can prove that it reviewed the individual's documents, retained the verification forms, and the individual attested to being authorized for work. *See* H.R. Rep. 99-682(I), 99th Cong., 2d Sess. 57 (1986).

Responsibility Act of 1996 (March 6, 1997) (the "Virtue Memorandum"). Before turning to the substance of the Virtue Memorandum, we first address the government's argument that the memorandum is owed *Chevron* deference.

We grant *Chevron* deference only where the agency exercised its delegated authority to promulgate rules that "carry[] the force of law." *See Mead*, 533 U.S. at 227. Where an agency action was not undertaken pursuant to a "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement" that carries the force of law, we are unlikely to find that the agency action carries such force. *See id*. at 230. In the instant case, the Virtue Memorandum was promulgated only informally, and with the expectation that formal regulations would be forthcoming. *See* Virtue Memorandum at 1 (explaining that "interim guidelines shall apply" only "[u]ntil implementing regulations are in place"). Accordingly, the Virtue Memorandum is not entitled to *Chevron* deference. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant *Chevron*-style deference.").

We must next consider whether the Virtue Memorandum is entitled to any deference under *Skidmore*. *See Mead*, 533 U.S. at 234–35. Whether the Virtue Memorandum should be given *Skidmore* deference depends on such factors as "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements," as well as its overall "power to persuade." *See id.* at 228 (quoting *Skidmore*, 323 U.S. at 140). We note that the Virtue Memorandum provides detailed, concrete

guidance for dealing with omissions that might appear on an I-9 Form, indicating that the agency did indeed consider the issue thoroughly. *See* Virtue Memorandum at 3–7 (§ A.3). We further note that, although the agency has not fully explained the rationale underlying its guidance, it has drawn the distinction between "substantive" violations and "technical or procedural" violations in a common-sense manner. For example, a failure to "ensure that the individual provides his or her printed name" is a substantive violation, while a simple failure to ensure that the individual also "provides his or her maiden name" is merely technical or procedural. Virtue Memorandum at 3, 4 (§§ A.3(a)(B)(1), A.3(b)(A)(1)). Further, the agency has consistently relied on the Virtue Memorandum in enforcing the statute for well over a decade. *See, e.g.*, *United States v. WSC Plumbing, Inc.*, 9 OCAHO no. 1071 (2001). Finally, we note the relative expertise of the agency when it comes to determining which omissions are substantive and which ought to be excused. *See Mead*, 533 U.S. at 228. In sum, we are persuaded that the classification of "substantive" violations and "technical or procedural" violations contained in the Virtue Memorandum is entitled to *Skidmore* deference and so hold. We now turn to the specific violations that KDS challenges in this case.

**3.**

The ALJ found, and KDS challenges, Section 1 violations (Counts II and IV) where employees failed to check any box in Section 1 of the I-9 Form, and where employees checked the box indicating lawful permanent resident ("LPR") status

but failed to provide an alien number.[9]  KDS also challenges the ALJ's finding of a violation where KDS created a new I-9 Form for a rehired employee by cobbling together a photocopy of Section 1 of that employee's previous I-9 Form with an updated Section 2.

KDS argues first that it is not responsible for errors or omissions made by employees in Section 1 of its I-9 Forms, but § 1324a(b) clearly makes employers responsible for documenting employee work authorization.  Where KDS chose to hire employees who had failed to fill out Section 1 completely, it did so at its own peril.

KDS also argues that it suffices for an employee to attest that he or she is authorized to work generally, and that there is accordingly no requirement for that employee to check a specific box in Section 1 of the I-9 Form.  The language of the statute compels the contrary conclusion, however: employees must attest to the specific category of eligibility into which they fit.  *See* 8 U.S.C. § 1324a(b)(2) (listing three categories that render an individual eligible for work in the United States, and requiring that individual to attest to one of them).   The Virtue Memorandum confirms that an employee's failure to check a box in Section 1 is indeed a "substantive" verification failure.  Virtue Memorandum at 3 (§ A.3(a)(B)(2)).

---

[9] The ALJ found no violation where an employee checked no box, but provided an alien number.  The ALJ also excused one violation, in accordance with the Virtue Memorandum, where the employee checked the box indicating LPR status and failed to provide an alien number, but KDS timely produced a legible copy of a document containing that employee's alien number.

Next, KDS contends that its retention and production of copies of certain of its employees' documents excuse deficiencies on the I-9 Forms where the copied documents provide the necessary information.  It is true that the Virtue Memorandum provides that some kinds of violations that would otherwise be "substantive" are rendered "technical or procedural" where the relevant information is available "on a legible copy of a document retained with the Form I-9 and presented at the I-9 inspection." *See* Virtue Memorandum at 4–5 (§ A.3(b)).  KDS was found liable for deficiencies in Section 1 related to its employees' failure to attest to a specific category of eligibility by checking the appropriate box, however, and such violations are classified as "substantive," notwithstanding the availability of copies of the relevant documents.  *See* Virtue Memorandum at 3 (§ A.3(a)(B)).  As we have noted, this is consistent with the language of the statute, which explicitly includes this attestation requirement.  *See* 8 U.S.C. § 1324a(b)(2).  Where the employee has not attested to the specific category of eligibility into which he or she fits, the statutory requirement is unfulfilled, regardless of whether other documentation might allow ICE to deduce the specific category to which the employee would have attested.  *See id.*

KDS argues that it should not be penalized for using a copy of Section 1 of an employee's previous I-9 Form to create a new form when it rehired that employee.  When an employer rehires an employee, it has the option of either using Section 3 of that employee's previous I-9 Form, or of creating a new form.  8 C.F.R. § 274a.2(c).  There is no option to proceed by cobbling together elements of the two.  This is because the requirement that employees sign Section 1 does not exist for its own sake, but rather to provide a concrete manifestation of the fact that, at the relevant time,

the employee performed the act of attestation.  *See* 8 U.S.C. § 1324a(b)(2) ("Such attestation may be manifested by either a hand-written or an electronic signature.").  Where a new I-9 is generated using a photocopied signature, the employee has not attested to anything with respect to that new form.  KDS' arguments to the contrary miss this critical point.

### 4.

The ALJ found, and KDS challenges, Section 2 violations (Counts III and IV) where those I-9 Forms that relied on driver's licenses as their List B document failed to provide either the issuing authority along with the license number or a copy of the drivers license.[10]  The ALJ acknowledged that the Virtue Memorandum does not address this eventuality, and so relied instead on *United States v. Carter*, 7 OCAHO no. 931 (1997), and *United States v. Candlelight Inn*, 4 OCAHO no. 611 (1994), to find that a failure to list the licensing authority is a substantive failure.  This was correct. *See Candlelight Inn*, 4 OCAHO at 233 ("By not specifying the state that issued the driver's license examined as a List B document in Section 2 . . . respondent has failed to identify the document that was utilized . . . .").  That ICE might have been able to deduce the issuing authority from the format of the license numbers is beside the point.  ICE might be able to sleuth out a lot of information on its own, but that does not relieve employers of their obligation to fill out Section 2 of their I-9 Forms "fully."  *See* 8 C.F.R. § 274a.2(b)(3).

---

[10] Where KDS provided copies of the licenses to ICE, the ALJ granted its motion for summary decision.

## C.

KDS contends that the ALJ should have considered certain copies of employees' verification documents that it produced for the first time together with its summary decision materials in connection with the administrative hearing. It further contends that these documents cure some of the deficiencies in the I-9 Forms to which they relate (but to which they were not attached and with which they were not produced). It explains that its failure to produce these documents earlier was the result of its having misunderstood the ICE subpoena, which asked for documents that were "attached" to I-9 Forms. Because it kept some of these documents in folders separate from its employees' I-9 Forms, KDS claims that it did not realize until later that these documents were important.

We first note the implausibility of this explanation: had KDS believed that its having copied these documents either satisfied the verification requirements of § 1324a(b)(4), or else cured deficient I-9 Forms, then it would have surely also known that it must *produce* them to show that it was in compliance once ICE began its investigation. Instead, it produced facially deficient I-9 Forms without any attached photocopied documentation at all, only later scrambling to produce the documents that it claimed excused the facially deficient I-9 Forms.[11]

More importantly, while the Virtue Memorandum does excuse certain deficiencies that would otherwise be

---

[11] The ALJ also noted that he found this position suspicious, and that some of the late-produced documents contained information that did not match information recorded on the I-9 Forms to which they related.

substantive where the missing information has been copied and retained, it does so only where that information may be found "on a legible copy of a document retained with the Form I-9 *and presented at the I-9 inspection*."     Virtue Memorandum at 4–5 (§ A.3(b)) (emphasis added). Therefore, the documents that KDS had not presented at the I-9 inspection could not excuse any substantive deficiencies in the I-9 Forms to which they related.  The ALJ properly refused to admit these untimely-produced documents.[12]

KDS attempts to re-frame this issue in terms of its having been punished for failing to present these documents in response to ICE's subpoena, or because it failed to keep those documents attached to the I-9 Forms to which they related. These characterizations are inaccurate.  No penalty was imposed for KDS' failure to provide the documents earlier, nor was a penalty imposed for the location or manner in which it chose to store those documents.  Rather, KDS was penalized for substantive deficiencies in its I-9 Forms. Accordingly, we reject KDS' efforts to invent issues that are not present in this case.

## D.

KDS argues that the ALJ erred in both its choice and application of penalty calculation.  Penalties are governed by 8 U.S.C. § 1324a(e)(5) ("Order for civil money penalty for

---

[12] KDS also contends that the ALJ was factually mistaken as to whether Section 2 had been signed on three I-9 Forms.  For all three forms, KDS initially submitted a form that lacked a signature in Section 2, and only belatedly submitted replacement forms with signatures.  The ALJ properly refused to consider these untimely-produced documents; there was no error.

paperwork violations"),[13] as codified in the regulations at 8 C.F.R. § 274a.10(b).

First, KDS argues that the ALJ should not have used ICE's penalty guidelines to calculate the formula. Although ICE's preferred method and recommendation is not binding on an ALJ, an ALJ acts within his discretion in adopting that method where the proposed penalties do not appear to be "disproportionate" or otherwise unsuitable given "other reasons particular to the specific case." *See United States v. Pegasus Rest., Inc.*, 10 OCAHO no. 1143, *5 (2012). Moreover, the statute itself establishes broad discretion when it comes to the determination of penalties. *See* 8 U.S.C. § 1324a(e)(5) (establishing civil penalty of "not less than $100 and not more than $1,000 for each individual with respect to whom such [a paperwork] violation occurred"). The ALJ's choice of calculation methods was clearly "allowable"; we will not disturb it. *See Balice*, 203 F.3d at 689.

---

[13] This subsection reads, in its entirety:

> With respect to a violation of subsection (a)(1)(B) of this section, the order under this subsection shall require the person or entity to pay a civil penalty in the amount of not less than $100 and not more than $1,000 for each individual with respect to whom such violation occurred. In determining the amount of the penalty, due consideration shall be given to the size of the business of the employer being charged, the good faith of the employer, the seriousness of the violation, whether or not the individual was an unauthorized alien, and the history of previous violations.

8 U.S.C. § 1324a(e)(5).

KDS also contends that the ALJ erred in its application of its chosen penalty calculation because he failed to make individualized penalty determinations with regards to each violation.   8 U.S.C. § 1324a(e)(5) requires that "due consideration . . . be given to the size of the business . . . , the good faith of the employer, the seriousness of the violation, whether or not the individual was an unauthorized alien, and the history of previous violations."   While this section requires the ALJ impose a penalty for each violation, it does not require the ALJ explicitly to make individualized findings with regards to each violation committed by the same business entity.   Indeed, the size of the business and any history of previous violations are necessarily considered generally.   The good faith of the employer also calls for a general analysis, and where, as here, many of the violations were similar, their seriousness lends itself to general consideration as well.   The primary question that calls for individual treatment is whether or not an individual was an unauthorized alien.   Here, the ALJ rejected ICE's contention that "some" of KDS' employees were unauthorized, and so a stiffer penalty should be imposed, on the ground that ICE failed to carry its burden to identify individually the unauthorized employees.  Thus, with respect to the one factor requiring an individualized finding, the ALJ ruled *in favor* of KDS.   Accordingly, we reject KDS' argument that the ALJ erred by failing to make individualized findings for each factor.

Next, KDS objects to the ALJ's finding that the penalty should not be mitigated for "good faith."   The ALJ found that KDS' choice to wait until 2006 to attempt to improve its I-9 compliance did not evidence a "good faith effort to ascertain what the law requires or to conform its conduct to it," especially since KDS had received a warning notice from the

INS as early as 2000. The ALJ also noted that the statute with which KDS had failed to comply was over twenty years old. He described KDS' compliance record as "dismal," but did not enhance the penalty for "bad faith." The ALJ clearly gave "due consideration" to KDS' position, *see* 8 U.S.C. § 1324a(e)(5), and his reasoned refusal to mitigate the penalty for "good faith" was neither arbitrary nor capricious. *See EEOC v. First Citizens Bank of Billings*, 758 F.2d 397, 403 (9th Cir. 1985) (simple assertion that defendant thought it was in compliance insufficient to establish good faith).

Finally, KDS argues that the ALJ's findings with regards to the seriousness of the violations were arbitrary and capricious. The ALJ declined to mitigate the penalty imposed for non-seriousness, noting that KDS had provided no "reasonable basis" for finding that any of the violations were not serious. He observed that "some increase might be justified for the most serious of the violations," but ultimately declined the government's request for such an increase on the ground that the penalty was high enough already.

Once again, KDS misconstrues the nature of the violations for which penalties were imposed when it argues that for many cases "the only violation was the failure to attach the copies [of the relevant verification documents] to the I-9 form." As we have already noted, the penalties were imposed for substantive deficiencies on the I-9 Forms themselves. That KDS might have had some of those deficiencies excused as merely technical or procedural pursuant to the Virtue Memorandum had it presented further documentation at the I-9 inspection is of no moment; it does not alter the nature or seriousness of the violations. The ALJ's refusal to reduce the penalty was neither arbitrary nor capricious.

## III.

For the foregoing reasons, KDS' petition for review is **DENIED.**